IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| KATHLEEN MIMS, KEVIN KEEVICAN, § | |
| BERNIE CASTILLO, CYNTHIA § | |
| NERLINGER, MICHAEL TERRAZAS, § | |
| CHAD KNEPP, ROLANDO CHAPA, § | |
| CHRISTINA GRIFFITH, PATRICIA § | |
| JOHNSON, and ROBIN WRIGHT, § | |
| § | |
| Plaintiffs, § | |
| § | |
| v. § | CIVIL ACTION NO. H-05-0791 |
| § | |
| STARBUCKS CORPORATION and § | |
| DOES 1 through 100, § | |
| § | |
| Defendants. § | |

MEMORANDUM AND ORDER

Pending is Defendant Starbucks Corporation's Corrected Motion
for Partial Summary Judgment with Respect to the Claims of Kevin
Keevican and Michael Terrazas (Document No. 52).  After carefully
considering the motion, response, reply, and applicable law, the
Court concludes the motion should be granted for the reasons that
follow.

I.  Background

Plaintiffs Kevin Keevican ("Keevican") and Michael Terrazas
("Terrazas") (collectively, "Plaintiffs"), who are former Store
Managers at Defendant Starbucks Corporation ("Defendant"), claim
that they were improperly classified as exempt from the overtime
requirements of the Fair Labor Standards Act ("FLSA"), 29 U.S.C.

§ 216(b).[1]  Plaintiffs assert that, despite their "store manager" titles, they were, in reality, "glorified baristas," and they primarily performed the job duties of these non-exempt, hourly employees.[2]  In addition to overtime wages, Plaintiffs seek liquidated damages, injunctive relief, attorneys' fees, and costs.

Defendant operates retail stores that sell coffee and related products.  Keevican was hired as an entry-level barista in March, 2000.  Document No. 54 ex. A at 13.  Keevican, who had prior management experience, was promoted to shift supervisor, assistant store manager, and then, in November, 2001, to store manager.  *See* id. at 13-14, 17-18, 160-63 & ex. A-10.  According to Keevican, in his first Starbucks store manager position, he "improved [the] store substantially," and he won a retail sales award and improved pastry sales by 200 percent.  Id. at 31.  Keevican was then "solicited" to work as manager for a larger Starbucks store, where he increased annual revenues from $500,000 to $1.4 million in "10

_____

[1] The Court previously granted an agreed motion to dismiss the claims of Plaintiffs Kathleen Mims and Christina Griffith with prejudice.  *See* Document Nos. 63 & 64.  In addition to Plaintiffs Keevican and Terrazas, former Starbucks Store Managers Bernie Castillo, Cynthia Nerlinger, Chad Knepp, Rolando Chapa, Patricia Johnson, and Robin Wright remain as Plaintiffs, but Defendant has not moved for summary judgment as to any except Keevican and Terrazas.

[2] In their complaint, Plaintiffs allege that "barista" duties include activities such as "waiting on customers, making drinks for customers, serving customers, operating the cash register, ensuring that the store remained clean and orderly, and cleaning and maintaining store equipment."  *See* Document No. 44 ¶ 19.

or 11 months" and again won a retail award.  *Id.* at 30-32.  As a store manager, Keevican worked an average of 70 hours per week.  *See* Document No. 61 ex. B ¶ 3.  His starting base salary as store manager was approximately $650 per week, and it increased to almost $800 per week (not including bonuses).  *See* Document No. 54 ex. A at 22 & ex. C ¶ 3.[3]  Keevican reported to a district manager, who supervised from 9 to 13 different stores in the district.  *See* <u>id.</u> ex. A at 258.  Keevican resigned from Starbucks in 2004.  *See* <u>id.</u> at 140 & ex. A-9.

Terrazas was hired as a Starbucks barista in December 2000, and he was promoted to shift supervisor, assistant store manager, and then to store manager in May, 2002.  *See* <u>id.</u> ex. B at 10, 13-14.  Terrazas worked as store manager for two different Starbucks stores, each of which generated between $1.2 and $1.4 million in annual revenue.  *See* <u>id.</u> at 14-15, 36.  Prior to October, 2002, Terrazas worked approximately 55 hours per week, and, after October, 2002, he worked an average of 65 hours per week.  *See*

---

[3] Plaintiffs testified in their depositions that baristas earned approximately $240 to $280 per week, and shift supervisors earned approximately $270 to $350 per week.  *See* Document No. 54 ex. A at 263-65; ex. B at 289-90.  Plaintiffs received bonuses tied to their stores' customer service and financial performance, as well as for training prospective store managers.  *See* <u>id.</u> ex. A at 22-28; ex. B at 26-29.  These bonuses--which were not available to hourly-paid baristas and shift supervisors--comprised between 10 to 20 percent of Plaintiffs' annual income.  *See* <u>id.</u>; ex. C ¶¶ 3-4, 7-8.  Plaintiffs also received certain fringe benefits, such as life insurance and paid sick leave, which were not available to hourly employees.  *See* <u>id.</u> ex. A at 42; ex. B at 23-24; ex. C ¶ 9.

Document No. 61 ex. D ¶ 3.  Terrazas's starting base salary as store manager was approximately $615 per week, and it increased to approximately $750 per week.  *See* Document No. 54 ex. C ¶ 4. Terrazas was terminated in 2005.  *See* id. at 15, 279.

It is undisputed that Plaintiffs, as store managers, were the highest-ranking employees in their respective stores, and they "[s]upervised and motivated" staffs of six to 30 Starbucks employees, including entry-level baristas, shift supervisors, and, in certain stores, assistant managers.  *See* Document No. 54 ex. A at 29, 166-67; ex. A-10 at 1; ex. B at 10-14, 36-37, 173; ex. B-10 at 1.  Plaintiffs testified that they were responsible for super- vising store personnel, "driv[ing] sales" and developing strategies to increase revenues, control costs, and ensure compliance with Starbucks policies.  *See* id. ex. A at 166, 175-76, 221-22, 311-12; ex. B at 155, 163-64, 240, 243.  They also oversaw customer service; prepared store reports and communications; processed employee time records, payroll, and inventory counts; ensured the safety of customers and employees; and implemented Starbucks policies and procedures.  *See, e.g.,* id. ex. A at 70-71, 177-78, 204, 318-319; ex. B at 217-220, 238-39, 251-52; ex. B-17; ex. B-22. In short, as Terrazas testified during his deposition, Plaintiffs were responsible for "anything that was to go wrong in [their] store[s] and anything that was done correctly."  *See* id. ex. B at 66.

4

Defendant now moves for summary judgment, arguing that Plaintiffs were executive employees who were exempt from the FLSA's overtime provisions as a matter of law.

## II.   Standard of Review

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. *See* id. at 2553-54.  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. *See* Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2514-15 (1986)).  "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence through the prism of the substantive evidentiary burden.  *See* <u>Anderson</u>, 106 S. Ct. at 2513-14.  All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  *See* <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 106 S. Ct. 1348, 1356 (1986).  "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper.  <u>Kelley v. Price Macemon, Inc.</u>, 992 F.2d 1408, 1413 (5th Cir. 1993) (citing <u>Matsushita</u>, 106 S. Ct. at 1351).  On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." <u>Id.</u> (citing <u>Anderson</u>, 106 S. Ct. at 2511).  Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." <u>Anderson</u>, 106 S. Ct. at 2513.

## III.  <u>Discussion</u>

### A.  <u>FLSA Standard</u>

The FLSA requires an employer to pay overtime compensation to any employee who works more than forty hours in a regular workweek. *See* 29 U.S.C. § 207(a)(1).  The overtime pay requirement, however, does not apply to employees working in a "bona fide executive, administrative, or professional capacity" as defined by regulations

6

promulgated by the Secretary of Labor.  *See* <u>id.</u> § 213(a)(1).  As the employer, Defendant has the burden of establishing that Plaintiffs fall within one of these exemptions, all of which are to be narrowly construed against it.  *See* <u>Dalheim v. KDFW-TV</u>, 918 F.2d 1220, 1224 (5th Cir. 1990).

New Department of Labor ("DOL") regulations governing exempt employees became effective in August, 2004.  Under the new regulations, an employee qualifies for the executive exemption if: (1) he is paid a salary of not less than $455 per week; (2) he has management as his primary duty; (3) he regularly supervises two or more employees; and (4) he has "the authority to hire or fire other employees or [be someone] whose suggestions and recommendations as to hiring, firing, advancements, [or] promotion . . . are given particular weight."  *See* 29 C.F.R. § 541.100(a)(1)-(4) (2005) (revised regulations).[4]  The parties are agreed that the only requirement at issue, under both the former and current regulations, is whether Plaintiffs' "primary duty" was one of management.

The regulations define "management" to include activities such as interviewing, selecting, training, and disciplining employees;

---

[4] Plaintiffs worked as store managers both before and after the effective date of the revised regulations.  The revised regulations increased the weekly salary requirement and added the fourth requirement.  *Compare* 29 C.F.R. § 541.1(f) (2004), *with* <u>id.</u> § 541.100(a) (2005).  The parties are agreed that, under both the former and current regulations, the only issue is whether Plaintiffs' "primary duty" was management.

setting pay rates and hours of work; directing and apportioning employees' work; handling employee grievances; planning and controlling the budget and inventory; ensuring safety of employees or the property; and monitoring legal compliance measures. *See* 29 C.F.R. § 541.102. An employee's primary duty is usually "what [the employee] does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." <u>Dalheim</u>, 918 F.2d at 1227. *See also* 29 C.F.R. § 541.700(a) (2005) (an employee's "primary duty" means "the principal, main, major or most important duty that the employee performs.").

Though the "amount of time" spent performing managerial work can be a useful guide in determining an employee's primary duty, time alone is not the sole test. *See* 29 C.F.R. § 541.700(b) (2005); <u>id.</u> § 541.103 (2004). Particularly with managers of retail establishments--who often perform managerial and non-managerial tasks concurrently and perform non-exempt tasks to "teach by example"--the case law is "replete with decisions holding [them] to be exempt, notwithstanding the fact that they spent the majority of their time performing non-exempt tasks or their need to obey corporate policies and/or follow the orders of their corporate superiors." *See* <u>Posely v. Eckerd Corp.</u>, 433 F. Supp. 2d 1287, 1302

(S.D. Fla. 2006) (collecting cases).[5]  *See, e.g.,* <u>Jones v. Virginia</u>
<u>Oil Co.</u>, 69 Fed. Appx. 633, 637 (4th Cir. 2003) (unpublished) (per
curiam) (manager who spent 75 to 80 percent of her time performing
basic line-worker tasks held exempt because she "could
simultaneously perform many of her management tasks"); <u>Murray v.</u>
<u>Stuckey's, Inc.</u>, 939 F.2d 614, 617-20 (8th Cir. 1991) (store
managers who spent 65 to 90 percent of their time on "routine
non-management jobs such as pumping gas, mowing the grass, waiting
on customers and stocking shelves" were exempt executives); <u>Kastor</u>
<u>v. Sam's Wholesale Club</u>, 131 F. Supp. 2d 862, 866-67 (N.D. Tex.
2001) (granting summary judgment for employer where retail bakery
manager spent 90 percent of time on non-exempt tasks).

Where an employee spends less than 50 percent of his time on
management, as both Plaintiffs claim they did, management may still
be the employee's primary duty if certain pertinent factors support
such a conclusion.  The four factors ordinarily considered are:
(1) the relative importance of managerial duties compared to other
duties; (2) the frequency with which the employee makes
discretionary decisions; (3) the employee's relative freedom from

---

[5] As Defendant notes, the DOL specifically endorsed this body of
case law in issuing the revised regulations.  *See* Final Rule, 69
Fed. Reg. at 22122-01, 22136-37, 22185-87 (2004) (noting that
"[f]ederal courts have found many employees exempt who spent less
than 50 percent of their time performing exempt work," particularly
in restaurant and retail settings, where "an employee can have a
primary duty of management while concurrently performing nonexempt
duties.").

supervision; and (4) the relationship between the employee's salary and the wages paid to employees who perform relevant non-exempt work.  29 C.F.R. § 541.700(a) (2005); id. § 541.103 (2004). Defendant argues that under these factors, each Plaintiff's primary duty was management, while Plaintiffs argue that the factors and the "sum total of [Plaintiffs'] duties" demonstrate that Plaintiffs' primary duty was "that of a barista, not a manager."

B.   Consideration of the Four Factors

    1.   Relative Importance of the Managerial Duties

Assessing the importance of Plaintiffs' managerial tasks relative to non-managerial work requires one to consider "the significance of the managerial tasks to the success of the facility." Jones, 69 Fed. Appx. at 637-38 (quoting Haines v. S. Retailers, Inc., 939 F. Supp. 441, 445 (E.D. Va. 1996)). See also Moore v. Tractor Supply Co., 352 F. Supp. 2d 1268, 1275 (S.D. Fla. 2004) (inquiry hinges on whether employee was "ultimately accountable for the store's success or failure."). It is uncontroverted that as store managers, Plaintiffs were the highest-ranking employees in their respective stores. See Document No. 54 ex. A at 28 & ex. B at 15-16. Plaintiffs either in their depositions or declarations acknowledged that they performed many management tasks, including: interviewing applicants and deciding whom to hire and promote for certain positions within their

authority, training and supervising staff, evaluating staff performance, disciplining some infractions, creating weekly work schedules, assigning staff's day-to-day tasks, deciding the amount of products to order, overseeing their stores' financial performance, controlling costs, and ensuring compliance with Defendant's policies (ranging from "safety and security policies" to "drink and quality cleanliness standards"). *See* Document No. 61 ex. B ¶¶ 4-6, 8, 10-11 & ex. D ¶¶ 4-5, 8, 11-12. *See also* Document No. 54 ex. A at 166-69, 174-76, 221-222, 311-312 & ex. B at 155, 163-64, 240, 243.   In connection with these duties, Plaintiffs attended management meetings away from their stores and were responsible for relaying the information they learned to their numerous subordinates. *See* <u>id.</u> ex. A at 69-71 & ex. B at 22, 104-05.

Plaintiffs' own testimony underscores the importance of their roles as store managers.   Keevican acknowledged that he was "ultimately responsible" for his store's operation, analyzed profit and loss reports, adjusted inventory orders, and monitored labor costs. *See* <u>id.</u> ex. A at 28, 125, 210-12, 222, 232-33. Keevican testified that he "substantially" improved the first store he ran, and he was later "solicited" to run a larger store, where he increased annual sales from $500,000 to $1.4 million in 10 or 11 months. *See* <u>id.</u> at 30-31. Keevican started a catering business at his store to increase revenue, and he trained his staff to "treat

11

the people that walk into our café right," because "making people happy brings in dollars." *See* id. at 173-74, 177-79.  Terrazas testified that he and "my team" "successfully led the second largest [Starbucks] store in the United States . . . to exceed company expectations" in sales, customer service, "promotability," cash flow, and inventory control.  *See* id. ex. B at 176-77.  *See also* id. ex. B-10 at 1.  Terrazas engineered a series of "themed" store promotions to increase sales and involved his store in community events.  *See* id. ex. B at 272-75, 281-82.  In sum, Terrazas testified, Plaintiffs were responsible for "anything that was to go wrong in [their] store[s] and anything that was done correctly."  *See* id. at 66.  *Cf.* Horne v. Crown Cent. Petroleum, Inc., 775 F. Supp. 189, 190-91 (D.S.C. 1991) (plaintiff's management tasks were comparatively more significant than non-management tasks because "whatever happened at her store, good or bad, she received the praise or blame."); Haines, 939 F. Supp. at 450 (same); Moore, 352 F. Supp. 2d at 1275 (although plaintiff store manager spent 95 percent of time on nonexempt tasks, his management tasks were more significant because he was "ultimately accountable for the store's success or failure," and he testified that he "had a positive impact" on the store and "made a difference").[6]

---

[6] The importance of Plaintiffs' managerial tasks is further evidenced by the criteria used to evaluate their job performances. Plaintiffs' Performance Reviews focused on their leadership and

Plaintiffs in response now maintain that they actually were "glorified baristas," and they submit two declarations in which they newly contend that they spent 70 to 80 percent of their time performing their "primary dut[ies]" of waiting on customers and making them drinks, covering for absent or tardy baristas, operating the cash register, ensuring the store and restrooms remained clean and orderly, cleaning and maintaining the store equipment, and demonstrating the use of coffee makers and other items sold by Defendant. *See* Document No. 61 ex. B ¶ 3 & ex. D ¶¶ 3, 6. (In Plaintiffs' Collective Action Complaint, First Amended Complaint, Second Amended Complaint, and current Third Amended Complaint, which were successively filed between May, 2005 and February 2006, Plaintiffs each time pled that their managerial duties as store managers required less than "*forty percent (40%) of their time.*" Plaintiffs' recent declarations make a dramatic further reduction of the time they claim to have spent in management.) Defendant correctly argues that Plaintiffs, in com-posing post-deposition declarations, "may not create a factual dispute by attempting to recharacterize the nature of [their] position." <u>Moore</u>, 352 F. Supp. 2d at 1276 (striking plaintiff's

---

overall store performance, *not* upon their performance of any barista tasks. *See* Document No. 54 ex. A-8; ex. B at 155-58; ex. B-9. It is also undisputed that Plaintiffs received bonuses tied to their stores' customer service and financial performance, as well as for training prospective store managers. *See* <u>id.</u> ex. A at 22-28; ex. B at 26-29; ex. C ¶¶ 3-4, 7-8.

affidavit, in which he "attempt[ed] to create a factual question" by newly fashioning himself as a "working foreman" instead of a manager). *See also* <u>Williams v. Vynckier Enclosure Sys., Inc.</u>, No. Civ.A. H-04-3223, 2005 WL 2810709, at *8 (S.D. Tex. Oct. 27, 2005) (disregarding affidavit to the extent it conflicted with deposition testimony regarding plaintiff's ability to fire employees).

Nonetheless, and giving full credence to Plaintiffs' declarations, no genuine issue of material fact has been raised regarding the critical importance of their managerial duties relative to their additional barista tasks. Although Plaintiffs now estimate that they spent 70 to 80 percent of their time performing non-exempt barista tasks, the Fifth Circuit has observed that an employee's "primary duty" is not determined "by applying a simple 'clock' standard that contrasts the amount of time each day an employee spends on exempt and nonexempt work." *See* <u>Dalheim</u>, 918 F.2d at 1227. Even so, Plaintiffs admittedly spent far larger proportions of their time on managerial tasks than did numerous other retail and restaurant managers who have been found to be exempt as a matter of law. *See, e.g.,* <u>Jackson</u>, 362 F. Supp. 2d at 1334 (90 percent of assistant store managers' time spent performing non-managerial duties); <u>Moore</u>, 352 F. Supp. 2d at 1273-74 (95 percent of store manager's time spent on non-managerial tasks); <u>Kastor</u>, 131 F. Supp. 2d at 866-67 (90 percent of retail bakery manager's time spent on non-managerial tasks). Moreover, the

14

uncontroverted record establishes that even while performing barista tasks, Plaintiffs simultaneously also performed many of their management tasks. For instance, Terrazas testified that while working on the floor, he served as a "role model" for baristas and observed their performance for purposes of enforcing company standards, completing evaluations, giving feedback, and recommending promotions and terminations. *See* Document No. 54 ex. B at 64-65, 68-69, 71-72, 180-81, 271-272.[7] Keevican testified that he "led by example" and served as a "role model" by modeling proper customer service while on the floor. He testified that he observed baristas "to make sure the[y] got the job done," and he gave his subordinates "positive feedback" and "constructive criticism" after observing their performance. *See* <u>id.</u> ex. A at 49, 177-78, 233-34. *Cf*. <u>Jones</u>, 69 Fed. Appx. at 635, 637 (manager who spent 75 to 80 percent of time on basic line-worker tasks because store was "often short-staffed" held exempt because she "could simultaneously perform many of her management tasks," such as supervising employees, handling customer complaints, dealing with vendors, and completing daily paperwork); <u>Jackson</u>, 362 F. Supp. 2d at 1335 (assistant managers who spent 90 percent of time on nonexempt tasks could simultaneously perform management tasks by

---

[7] In fact, Terrazas testified that it was part of "effective management style" to work "in the trenches" with his baristas, to the extent that "most of [his] customers didn't know [he] was the manager." *See* Document No. 61 ex. C at 68-69.

"overseeing the other employees in the store and making sure that the store was operating properly.").

Plaintiffs also contend that their management duties were relatively insignificant because they shared "key responsibilities" with their "entire teams" and subordinates.   However, as the highest-ranking employees in their respective stores, it is uncontroverted that each Plaintiff was "ultimately responsible" for his store's operations.   *See* Document No. 54 ex. A at 28 & ex. B at 15-16, 66-67.   It is "irrelevant to the primary duty inquiry" that Plaintiffs, in their discretion, may have chosen to delegate some managerial tasks to their subordinates.   *See, e.g.,* Document No. 54 ex. A at 66-67, 111-12, 219; ex. B at 44-45, 88-90, 162. *Cf.* Murray, 939 F.2d at 618-19 (finding it "irrelevant to the primary duty inquiry" that store managers delegated some managerial duties and that their subordinates were capable of performing such duties); Thomas v. Jones Rests., Inc., 64 F. Supp. 2d 1205, 1207, 1211 (M.D. Ala. 1999) (restaurant manager who delegated managerial duties was "ultimately responsible" for the performance of these duties).   Although Plaintiffs delegated some managerial tasks to their subordinates, "such delegation does not render the duties any less 'managerial,'" nor does it "minimize the importance of the duties or render them non-exempt." Moore, 352 F. Supp. 2d at 1276. *See also* Baldwin v. Trailer Inns, Inc., 266 F.3d 1104, 1115 (9th Cir. 2001) ("That the assistant managers may have performed some

managerial tasks does not render the tasks nonexempt."). In fact,
as observed above at page 3, note 3, and pages 12-13, note 6,
Plaintiffs' bonuses were based in part on how well they trained
prospective store managers, which obviously incentivised Plaintiffs
to delegate selected managerial responsibilities to subordinates in
order for Plaintiffs to achieve their own successes as managers who
could well train others.

The uncontroverted summary judgment record establishes that
Plaintiffs' significant managerial functions--such as ordering and
controlling inventory; deciding whom to interview and hire for
barista positions; training and scheduling employees; special
marketing promotions; and monitoring labor costs--were critical to
the successes of their respective stores. *See, e.g.,* <u>Jones</u>, 69
Fed. Appx. at 638 ("[T]he [retail establishment] could not have
operated successfully unless [plaintiff] performed her managerial
functions, such as ordering inventory, hiring, training, and
scheduling employees, and completing the daily paper-work."). If
Plaintiffs while each managing a store with annual sales exceeding
$1 million were able to spend 70 or 80 percent of their time
pouring coffee and performing other barista chores that six to 30
subordinates also performed, those activities of the manager quite
obviously were of minor importance to Defendant when compared to
the significant management responsibilities performed during the
other 20 to 30 percent of their time, management responsibilities

17

that directly influenced the ultimate commercial and financial success or failure of the store.

   2. and 3.   <u>Frequency of Exercise of Discretion and Relative Freedom from Supervision</u>

      It is uncontroverted that Plaintiffs, as the highest-ranking employees in their stores, made decisions on matters such as deciding whom to interview and hire as a barista, whom to assign to train new hires, when to discipline employees, whom to deploy in certain positions, what promotions to run, and the amount of product to order for efficient inventory control.  Plaintiffs argue, however, that they infre-quently exercised discretion because they worked under the "ultimate managing authority" of their district managers, who had authority to hire more senior employees, approve changes to Plaintiffs' work schedules, set rates of pay for newly-hired employees if the pay exceeded Starbucks's guidelines, and establish guidelines for Plaintiffs when completing performance reviews.  *See* Document No. 61 at 13-14.  However, "the manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity."  <u>Jones</u>, 69 Fed. Appx. at 638 (quoting <u>Murray</u>, 939 F.2d at 619)).  *See also* <u>Posely</u>, 433 F. Supp. 2d at 1302 ("[T]he case law is replete with decisions holding managers of retail establishments to be exempt, notwithstanding

18

. . . the need to obey corporate policies and/or follow the orders of their corporate superiors.") (collecting cases). *See, e.g.,* Jackson, 362 F. Supp. 2d at 1335 (rejecting assistant managers' contention that they lacked discretionary power because "the fact that Plaintiffs had to adhere to certain guidelines or in certain instances obtain the Store Manager's approval does not diminish Plaintiffs' discretionary powers."); Haines, 939 F. Supp. at 450 (discretion factor weighed in favor of employer, notwithstanding store manager's "rigid supervision" by upper management, because store managers are generally vested with enough discretionary power and freedom from supervision to satisfy this factor); Kastor, 131 F. Supp. 2d at 867 (plaintiff was exempt executive although he lacked "*final* decision-making or supervisory authority in the operation of the bakery department") (emphasis added).  The fact that Plaintiffs' district managers had "veto power" over some of Plaintiffs' discretionary, managerial decisions does not raise a fact issue that Plaintiffs' primary responsibility was not in management. *See* Thomas, 64 F. Supp. 2d at 1213.

Plaintiffs also contend that they were not relatively free from supervision because their district managers spent "substantial amounts of time" in Plaintiffs' stores.  Keevican states in his Declaration that his district manager visited his store "3-4 times per week, staying, on average, a few hours to all day each visit," and she "issu[ed] directives" by phone and e-mail.  *See* Document

No. 61 ex. B ¶ 9.   Terrazas avers that his district managers visited the store "almost every day" or "every other day," and stayed in contact by e-mail and phone when not physically in the store.   *See* id. ex. D ¶ 9.   Plaintiffs aver that, during these visits, the district managers checked sales figures, repositioned products, observed and directed employees, and ensured that Starbucks's policies were being followed.   *See* id.; ex. B ¶ 9. Keevican admitted in his deposition that his manager generally supervised from 9 to 13 different urban stores spread over all of downtown Houston, parts of southwest Houston, and the Texas Medical Center, with some stores being located as much as a 30 minutes drive from others.   Terrazas recalled that his manager had approximately nine stores to supervise, which were located in a very large district with some stores being "extremely far apart." On the other hand, it is uncontroverted that each Plaintiff as store manager was the single highest-ranking employee in his particular store and was responsible on site for that store's day-to-day overall operations.   *See* id. ex. A at 28, 258-59; ex. B at 15, 66, 127, 254.   *See, e.g.,* Thomas, 64 F. Supp. 2d at 1214 (plaintiff was relatively free from supervision although supervisor "called ten to 15 times a day and, initially visited the restaurant everyday" because plaintiff was "answerable for the performance of the [restaurant].") (internal citation omitted); Mitchell v. Abercrombie & Fitch, Co., 428 F. Supp. 2d 725, 743 (S.D. Oh. 2006)

(granting summary judgment to defendant employer where plaintiff store manager's District Managers "regularly visited his store and retained authority to override certain of his management decisions" because such supervision "did not undermine his day-to-day authority, as the highest ranking manager on job site, or render him non-exempt."), *citing*, <u>Murray v. Stuckey's, Inc.</u>, 50 F.3d 564, 570 (8th Cir. 1995) ("[A]ctive supervision and periodic visits by a regional manager do not eliminate the day-to-day discretion of the on-site store manager."); <u>Haines</u>, 939 F. Supp. at 450 (store manager exempt despite her inability to hire or fire without upper management's approval and her rigid supervision and frequent visits by upper management).  Indeed, department and assistant managers have been held exempt under the executive exemption even when their superiors worked in close proximity to them at the same location. *See, e.g.,* <u>Kastor</u>, 131 F. Supp. 2d at 862; <u>Jackson</u>, 362 F. Supp. 2d at 1327-28; <u>Donovan v. Burger King</u>, 672 F.2d 221, 223, 225 (1st Cir. 1982).  Viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs still were "vested with enough discretionary power and freedom from supervision to qualify for the executive exemption." <u>Jones</u>, 69 Fed. Appx. at 638 (quoting <u>Haines</u>, 939 F. Supp. at 450).

4.   <u>Comparative Compensation</u>

The final factor is the relationship between Plaintiffs'
salary and the wages paid to non-exempt employees.   Plaintiffs
argue, with no supporting evidence, that their compensation
"approximated that received by *some* assistant store managers."   *See*
Document No. 61 at 15 (emphasis added).   It is undisputed, however,
that Plaintiffs received nearly twice the total annual compensation
received by their highest-paid shift supervisors, *see* Document No.
54 ex. A at 263 & ex. B at 289-90, and Plaintiffs received bonuses
and benefits not available to other employees (including assistant
managers).   *See* <u>id.</u> ex. A at 25-28 & ex. B at 23-24.   This marked
disparity in pay and benefits between Plaintiffs and the non-exempt
employees is a hallmark of exempt status.   *See, e.g.,* <u>Kastor</u>, 131
F. Supp. 2d at 869; <u>Moore</u>, 352 F. Supp. 2d at 1278-79; <u>Jones</u>, 69
Fed. Appx. at 639.

Applying the four factors to the uncontroverted evidence
viewed in a light most favorable to Plaintiffs, compels the
conclusion that each Plaintiff's primary duty was management and,
as such, Plaintiffs were properly classified as exempt from the
FLSA's overtime provisions as a matter of law.   Defendant is
therefore entitled to summary judgment on Plaintiffs' claims.

IV.   <u>Order</u>

For the reasons set forth, it is hereby

ORDERED that Defendant Starbucks Corporation's Corrected Motion for Partial Summary Judgment with Respect to the Claims of Kevin Keevican and Michael Terrazas (Document No. 52) is GRANTED, and Plaintiffs Kevin Keevican and Michael Terrazas's claims against Defendant Starbucks Corporation are DISMISSED on the merits.

The Clerk will enter this Order and send copies to all counsel of record.

SIGNED at Houston, Texas on this 2nd day of January, 2007.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE